Good morning. Judy Snyder appearing for the appellant, Dawn Reynolds, and I would like to reserve two minutes for rebuttal argument. This case presents important issues to the citizens of the state of Oregon. And in particular presents important issues to the citizens of the City of Eugene. Because in Ms. Reynolds' role as the Deputy Police Auditor, she had observed and reported substantial misconduct both in the office of the Police Auditor and within the office of the Eugene Police Department. And in exchange for her reports of that misconduct, her employment was terminated in May of 2010. Although there are several issues before this Court, they break into two principal categories. Did the district court err in granting the defendant's motion for summary judgment, dismissing Ms. Reynolds' claims against the Police Auditor, her boss, Mr. Gissiner, for First Amendment retaliatory termination under 42 U.S.C. 1983, and dismissing a claim against him for intentional interference with economic relations? And did the Court err in denying Ms. Reynolds' motion to reassert a claim of wrongful discharge against the City of Eugene? I'll mention parenthetically there were a couple of other charges against the City of Eugene under State statutes, which the Court declined to continue jurisdiction on and referred them back to the Lane County Court when summary judgment was granted. So could we take up the First Amendment issue? Please. Okay. That's the core. So she was in this – she was the Deputy Police Auditor. Correct. For a period of time, right? She was the Deputy Police Auditor for two years. Within that two-year period, she briefly served as the interim. I read as much as I could of the filings in the district court, and I'm still trying to understand what her duties were at the time of her termination. Then let me help respond to that. Where in the record is it documented what her duties were? There is no job description for Ms. Reynolds. Her duties were delegated to her by the police auditor. The police auditor's office had three responsibilities, to receive citizen complaints, to then process those complaints and refer them off to the Office of Internal Affairs in the processing of complaints. And the police officer delegated to her some of those duties, most specifically taking citizen complaints. So that was her duty, to take citizen complaints? That was one aspect of her duty? Correct. So she was – what, would interview somebody who had a complaint? Yes. What they would do is a citizen would come in, they would meet at the office, and she would sit down and talk with them about why they were there, what their concern was about police activity. Those meetings were tape recorded. And from the information provided by the complainant, she would prepare a summary and prepare it to – send it to the police auditor. Does she have any other duties? Not direct duties. She had other interactions that she had. She interacted on occasion with a separate agency, the Civilian Review Board, which was a group of citizens that were also assigned the responsibility of police oversight. But she had no direct responsibilities to the Civilian Review Board. Who did she report to? Mr. Gissiner. That's it? That's it. And Mr. Gissiner reported to the city council. So what are the statements that you're relying upon to show that she was retaliated against? The evidence is pretty substantial, and that's why I say there's a shocking issue of fact here for the jury to consider. We start with the fact that Mr. Gissiner began his employment in July of 2009. Keep in mind, she was terminated in May of 2010. So she was in her role under Gissiner for 10 months. He had no sooner been in office for a matter of weeks till he met with her. And he said to her in that meeting, and I'm specifically quoting from the record, that he directed her to – that nobody wanted to hear her complaints. They just wanted to know the system was working and that she should shut up. The additional record and information in the record, which I think is the strongest in terms of his knowledge, is he directed her to discontinue the practice of sending to the Civilian Review Board the evidence that she was sending them of updates in the Ninth Circuit law and relevant case law. He told her to shut up. Nobody wanted to hear her complaints. What does that have to do with the First Amendment violation? He told her, you know, keep your comments to yourself. Why does that give rise to a First Amendment violation? Because as she became aware of serious misconduct within the office of the PA, including the fact that Mr. Gissiner was ordering staff to shred records of the public records law. Did she report to the city council or to the DA or to the U.S. attorney that there was shredding going on? She reported that information specifically to several people. She reported it initially to Mr. Gissiner himself to tell him that that was a violation of the State statute. In response to his lack of interest in considering the public records violation, she then spoke to the members of the city council individually, not as a group, to report to them what was going on. In addition to that, she told the head of the CRB. Now, what's most significant about that is Mr. Gissiner learned about that. As a matter of fact, you will find within the record, we cited it several times, an e-mail that she sent to Mr. Gissiner on May 10 of 2010 saying, you can't shred these documents. It violates the state public records law. On that date, Mr. Gissiner sent an e-mail to the city attorney and he said, words to the effect, look what she's complaining, reporting. And he made a comment in that e-mail to the city attorney, I wonder who she's going to report me to now. Two days later, the city attorney told him that, in fact, he had to retain those records. And within a week, he made the decision to fire Don Reynolds. What other statements did she make that you're alleging constitute retaliation or lead to retaliation? Thank you for asking. The information that she provided to Mr. Gissiner, he then reviewed to decide which went on up to Eternal Affairs as matters of misconduct that had to be investigated by Eternal Affairs or mere service complaints. What she found is that he was taking matters of serious concern by the citizens and characterizing them as service complaints so they never went through IA review and never went through the civilian review board process. She reported to him that that was inappropriate, that he was downgrading serious complaints. She then reported that to members of the city council and to the mayor. Other evidence that he knew that she was making reports is in February of 2010, after she had gone to the mayor to report her concerns about what was happening within the PA's office and within Eternal Affairs, after she went to the mayor's office, within days, he called her into his office and in an angry voice again told her to shut up. No one wants to hear her complaints. So he told her that in July. He told her that in February. She reminded him in May. Pardon me. No, go ahead. Finish up. She reminded him in May that he had repeatedly told her to shut up and that she felt these were important issues that had to be reported, and he terminated her. Mr. Gissiner, in his affidavit or in the city's response, identified I think it was four or five issues that he relied upon as the reason why he terminated her. And those were all reasons that were developed and were reported to Ms. Reynolds well after she was terminated. When she was terminated, she was given no reason. The first time she heard that there was any reasons to support the termination was when she went through an unemployment process. We have addressed each of those issues, and we believe there are substantial issues of fact as to each of those issues. Yes, sir. Distinguished between Reynolds and the office of the police auditor, did the office itself have a duty to report to the mayor, the city council, the CRB? No. No? No. Mr. Gissiner No, I'm talking about the office. I'm not talking about Ms. Reynolds' functions. Oh, you know, that's an interesting question. I don't believe there's any directive in the ordinance about what the responsibility is of the office as a whole. The chain of command was pretty direct from the PA, I'm sorry, police auditor to the city council. And there is nothing in the ordinance or even in the interpretations of the ordinance that I'm aware of that suggest otherwise. Well, who can Mr. Gissiner as the police auditor report to or communicate with in the city hierarchy? Well, clearly he reported with and communicated with a wide number of people, including the internal affairs, but in terms of hierarchy, he directly reported to the city council. Was it within the scope of his duties to report or to communicate with the mayor or the city council? Yes, within his duties. So within the office of the police auditor, communications would be appropriate between that office. Put aside who, between that office and the mayor, city council, the city manager, the city attorney, would that be fair? That would be fair regarding matters involving either the office or police activities. Okay. So when this decision was made by the trial court, the judge did not have the benefit of the decision of this court in 20,000, in 2013 in Dalia v. Rodriguez. And I think Dalia v. Rodriguez sets a great framework within which to analyze this First Amendment claim. And I know Judge Paez wrote the opinion, so I'm not going to go into any great detail. But in terms of the threshold issue of whether there were issues of fact, certainly the issues of the responsibilities of a public official or a public employee normally are considered issues of fact to be decided by the trier of the fact. This is exactly the sort of circumstance which we had believed would go to a jury and the jury would hear the substantial evidence, which I will acknowledge is in conflict. Certainly Mr. Gissiner, through his testimony, has created conflict in the record about what he knew or who had what responsibilities. But you cannot ignore, you cannot ignore his May 5, 2010, email to the city attorney in which he reported what she was saying about his destruction of public records within the office, and made the comment, she's going to report me to someone. He was clearly concerned about the fact that she was not tolerating the misconduct within the office or the misconduct of the Eugene officers. Did you want to say a little bit about the interference claim? About yes, yes, thank you. That's a State claim. It's a common law claim. And, you know, the real issue in that is whether or not Mr. Gissiner was just doing what he was supposed to do for the public good under his role as public police auditor, or whether he was doing it for his own purpose. And, you know, while there is certainly no direct evidence in the record where Mr. Gissiner said, well, I'm getting rid of her because I'm tired of her complaining to people about me, there is ample evidence, not the least of which is timing, to suggest that he got rid of her because of the complaints. Right after she went to the mayor in February, he angrily met with her and told her to shut up and not to talk to people. And in May, as she was reporting to others outside of his office about the destruction of public records, he again said to the city attorney in that e-mail, she's going to report me to someone. He was Well, whether right or wrong from a First Amendment standpoint, didn't he in part dismiss her because she violated his direct orders? If the direct order was don't talk to people, then that is an interesting sort of dichotomy. Give up your right to report misconduct. I'm saying put aside the First Amendment issue, whether he was right from a First Amendment standpoint in giving that instruction or not. She nevertheless violated his direct orders, correct? I would say, and I will stand by the fact she violated his direct order because she continued to report his misconduct. You want to save the rest of your time? I do. Thank you so much. May I please the court? I'm Jerry Lidge, appearing for both the city of Eugene and for Mark Gissner. I want to focus, as to the First Amendment claim, on two main points, whether plaintiff spoke in her capacity as a public employee and whether or not there is any reasonable basis for a fact finder to conclude that her complaints or reports were the cause of her termination. Well, the first point you raised is what directed my questions to counsel when she was up here. What were her duties? Your Honor, there is no specific job description for the deputy police auditor. This is an office that has three city employees. One is an administrative assistant. So basically Mr. Gissner and Ms. Reynolds as his deputy. So it is, I mean, deputy means able to act in the stead of the principal. And I think generally it is... That was all? That was just she was able to act? That was her duty? She was able to act in his stead? He did put restrictions... But he seemed to put limitations on that. Yes, he did. He did put limitations on that. It seemed like, you know, she was deputy police auditor for a while under another police auditor. Yes, she was. And then that person left for whatever reason, and she then became the acting police auditor. Yes. And then the new fellow was hired, Mr. Gissner, and she then became again the deputy police auditor. Yes. And it looked like there was a change in the way the office was administered after Gissner took over. That is definitely true, Your Honor. He really asserted his role as the police auditor, and she was told, you are, you know, you report to me. Exactly. And when he arrived, she had served as the deputy, as the interim police auditor for, I believe, eight or nine months. During the spring of that year, the city council had placed her on administrative leave for, I think, about a month. And then when the council reinstated her, it was with the finding that she had exercised poor judgment. He was aware of that, obviously, and he was aware of tension between her and the Eugene Police Department and lots of back and forth between Ms. Reynolds and the department. So one of the things he did say, according to Ms. Reynolds, it's not what Mr. Gissner says, but her report is, he said to her, you need to be rehabilitated. I think that's understandable in that context. He said, basically, you know, I am the one who is going to speak on official matters for the auditor's office, and, you know, we need to redefine what your role is going to be. So one of the things we looked at in Dahlia, and, you know, in the police department in Burbank, there's a very hierarchical structure, and so there's a scheme of reporting that the police officers are supposed to follow. And here, it looked like Ms. Gittin, like the plaintiff, was required to report to Mr. Gissner, not, if she had complaints, those complaints were to go to Gissner, not to anybody else. That seems to be kind of what happened after Gissner took office. I think that is, Your Honor, I think that is, I want to draw a distinction between complaints that she has about functioning of the office, as opposed to complaints that involved citizen complaints about the conduct of the police. And because her function, in large part, was to raise issues concerning the behavior of the police department, all of those complaints that she describes fall directly within her job responsibilities. Are you referring to her concern that the police department had de-linked documents on their website? Yes, Your Honor, I am. Those are core functions of the job, is how were the records in the internal affairs department being maintained. So I want to focus in a little bit of detail on two things that the Court asked about. One is the, and that plaintiff relies heavily on, one is the characterization that Mr. Gissner told her to shut up. Most of the references in her brief are to where she says he told me to shut up, or simply to her answers to interrogatories where she says he told me to shut up. Because she relies very heavily on that, I want to look in the record for where is their context for this, because people say shut up in a lot of different ways. And at excerpt of record page 158, there is an email exchange between the two of them that I think is illustrative, and it's the only place I found where there is in the record discussion of what happened. And he had sent her email saying it's regrettable that you say I told you to shut up, I never did. And she responds, and this is a quote, you have said keep your mouth shut on more than one occasion, the most recent being March 19th. The specific context was my objection, that is Ms. Reynolds' objection to the sometimes unprofessional comments made by EPD employees. You said, this is quoting Mr. Gissner, when they insult you, they are really insulting me, taking a jab. I don't let it bother me, you shouldn't let it bother you, just keep your mouth shut. To me, that is advice not to rise to the bait. It's not a direction that she may never speak. But she seems to, I agree, she seems to interpret it that way. Take that into context, so let me ask you this. So considering her concerns about the operation of the office, the function of the office, was it proper for her to complain to city council members about Mr. Gissner and the office? Your Honor, that's a difficult question. Well, that's what the First Amendment, that's what this case is, I mean, what it's down to right now at the moment. What bothers me just a little bit is that the district court didn't have the Your Honor, let me go back to Dahlia in a minute, but may I also mention to the extent that Dahlia overruled Huppert, just to touch briefly on qualified immunity, Mr. Gissner would be entitled to rely under Huppert, so. That's another question. That's a whole other issue. Okay. So generally the content of the job responsibilities is a question of fact, but of course it is plaintiff's burden to produce those facts. The chain of command is relevant, but it's not dispositive. And admittedly, if somebody speaks outside the chain of command, that weighs against the finding that she's speaking a part of her job. But here, the people that she spoke to were all people, these were relationships that she had built through her job. When she was the prior deputy auditor, when she was the acting auditor, she interacted directly with the civilian review board members and with the city council. And the comments she made were to those same people about responsibilities of the office. And in Dahlia, this court noted that if the complaints concern misconduct or abuse, it's unlikely that they're within job duties, except when the employee's regular job duties include investigating such conduct, such as internal affairs. Where we're focused on, her duties didn't encompass investigating internal operations of the police auditor's office. Her duties, as you started out with, were to help citizens complain. Correct. Process their complaints against alleged misconduct by police officers. Correct. So as I understand it, she had two specific complaints about the operation of the office, which she identified as being misconduct. One, that Mr. Gissner was misclassifying complaints. And the other, that Mr. Gissner had shredded documents in violation of the Oregon Public Records Act. Yes, Your Honor. And she was concerned that both of those were misconduct. And she reported them, I think, to city council members, to the CRB president, in one case to the mayor. So she classifies that as whistleblowing. And in retaliation for that, she was fired. So why wouldn't she have a chance to say that at trial? Your Honor, two reasons. One is, first of all, as a matter of law, the first concern about the way Mr. Gissner classified complaints, that's not misconduct. That the police auditor ordinance specifically says the auditor will use independent judgment in all matters, and that how to classify civilian complaints is exclusively within his authority. So you're saying that was just a difference in their evaluation of how the office should be run? Right. That is correct. I want to talk a minute about the record shredding. This is a good example of the miscommunication between Mr. Gissner and Ms. Reynolds. He says, I told the assistant to shred duplicate records. And I was troubled that Ms. Reynolds was holding on to duplicate records that, by law, were supposed to be returned to the Internal Affairs Office. She says he ordered her to shred records that included, although they were copies, they included some original notes from the Internal Affairs Office. He said that I never said shred original records. It's worth noting that the records that were being shredded were from 2007 and 2008, before Mr. Gissner arrived. There is nothing in the record to suggest that he was trying to cover up or hide anything. Well, but isn't that a factual issue that should go to the jury? Your Honor, I don't think there's a factual issue for a jury unless there is some evidence to support that position. And on summary judgment, the plaintiff has the burden to produce some evidence, not only that this was a concern to him and that it motivated him. He says that this is the one or two of the instances that she says were the things for which he retaliated. This is the one of which he really knew. But the opposing counsel says, well, he was aware of this. He raises it to the city attorney and says, you know, she's going to report me to someone. Your Honor, I think if you look at the record in context, there is nothing to suggest that that was more than a flip comment based on the difficulties in their relationship. There's nothing in the record to suggest he has any concern about what she is complaining about, because he says, if I'd known they were not duplicates, I mean, I thought I didn't tell her to, to the assistant to shred anything that wasn't a duplicate. So, again, we have a conflict as to what was said, but when you look at the conversation back and forth, this is just a bad miscommunication and it characterizes their relationship. I want to touch briefly on two other things. Well, one other thing, and that is the reasons that Mr. Gissner did terminate her. First of all, she's an at-will employee, so the fact that he did not give her reasons when he terminated her is irrelevant. He provided several reasons, five reasons. They are clearly examples of things that caused him to think she had poor judgment and that she was insubordinate. One of them involved her persistence in ---- Well, you know, one of the defenses is that they would have fired her anyway. Yes. But that seems to be, you know, that seems to be a clear factual dispute. Your Honor, we did not get to that on summary judgment. We focused only on the first three parts of the Eng test. So we didn't ---- Did you want to address the other two points? I mentioned qualified immunity briefly. On the intentional interference with economic relations, I would simply say that the Oregon law is clear that you do not act solely in your ---- unless the employer is acting solely in his own personal interest, the claim will not lie. And here, even under Ms. Reynolds' version of the facts, he was acting to, she says, please, other two or three city counselors and the police chief. That in itself would be enough if it weren't for all the other reasons that he did have. Okay. Thank you, counsel. Thank you, Your Honor. I believe there's a minute for rebuttal. I do. Thank you, Your Honor. You know, on the intentional interference of economic relations case, I think we have to be careful about our language. The case law which we cited in our appellant's brief makes it, I think, fairly clear that, yes, while the actor needs to be at least partially motivated to serve the employer, you still look at whether the actor, in this case Mr. Gissner, had an interest in the decision to terminate. Within the seconds remaining, I just want to say Ms. Reynolds has waited five years for a jury trial on this matter, but the citizens of the City of Eugene have waited five years. This is an ordinance they passed and adopted because of serious police misconduct that had preceded the creation of the Office of Police Auditor and the Civilian Review Board. And the citizens need to have a full opportunity to hear how that office has been conducting its business and how Internal Affairs has been handling citizen complaints. To that extent, because this case does raise important First Amendment rights and there are substantial issues of fact, we request a reversal. Thank you.
judges: Selna, Paez, Ikuta